UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

CORNELIUS PHELPS

          Plaintiff,                        Case No. 1:23-cv-11020

v.                                    Honorable Thomas L. Ludington
                                    United States District Judge

CITY OF SAGINAW, et al.,

          Defendants.

_____/

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT IN PART
AND DENYING IN PART**

On June 23, 2023, Plaintiff filed his Amended Complaint alleging several counts deprivation of rights under both 42 U.S.C. § 1983 and state law. He alleges that Defendants violated his constitutional rights and state law when they used force to arrest him during a protest at the Fraternal Order of the Police in Saginaw, MI in the summer of 2020. On February 4, 2025, Defendants filed a motion for summary judgement arguing, among other things, qualified immunity. While much of Defendants' motion will be granted, Plaintiff is able to overcome the qualified immunity bar as it pertains to one of the Defendants. Thus, Defendants motion for summary judgement will be granted in part and denied in part.

**I.**

**A. Factual Background**

Plaintiff Cornelius Phelps is a black man and activist involved with the "Ghost of George Floyd" (GOGF), a coalition of activists who staged protests in the wake of the death of George Floyd at the hands of police officers in Minneapolis. U.S. DEP'T JUST., *Three Former Minneapolis Police Officers Convicted of Federal Civil Rights Violations for Death of George Floyd* (Feb. 24,

2022) [https://perma.cc/68TE-KBGP]. GOGF held multiple events in 2020, some of which took place at Jeffer's Park in Saginaw, Michigan, adjacent to the Saginaw Police Department (SPD). ECF No. 53 at PageID.787. These events often involved setting up a table and inviting law enforcement to join the group in conversation—even succeeding in speaking with Saginaw's Chief of Police. *Id.*

During that same period, concerns about excessive force within the SPD arose. On July 11, 2020, SPD Officer Adam Collier punched a handcuffed woman who was in custody. COLE WATERMAN, *Ex-Saginaw Police Who Punched Handcuffed Woman Sentenced to Community Service, Anger Management*, MLIVE (Apr. 27, 2023), https://tinyurl.com/5n87cvm2. SPD later terminated Collier's employment. COLE WATERMAN, *Fired Saginaw Police Officer Charged by Michigan AG in Jail Assault*, MLIVE (Sept. 15, 2020), https://tinyurl.com/2sm6z5rw.

In response to Collier's termination, SPD officers reportedly engaged in a "blue flu" protest, calling in sick for three days. ECF No. 53 at PageID.788. Plaintiff alleges that both Defendants Vincent Jackson and Terrance Moore—two SPD officers—participated in this protest.[1] *Id.* On July 26, 2020, believing that SPD officers' blue flu protest was unconscionable, Plaintiff organized a demonstration in front of the Fraternal Order of Police of Saginaw (FOP).[2] *Id.* at PageID.788–89. Plaintiff and members of GOGF selected a parcel of land adjacent to the FOP property, believing that it was public property based on a review of GIS records.[3] *Id.* at

---

[1] Both Defendants were investigated for their participation in this event. *See* ECF Nos. 47-6 at PageID.660; 47-3 at PageID.598.

[2] FOP is a Michigan non-profit police lodge. ECF No. 20 at PageID.184.

[3] "GIS connects data to a map, integrating location data (where things are) with all types of descriptive information (what things are like there). This provides a foundation for mapping and analysis that is used in science and almost every industry. GIS helps users understand patterns, relationships, and geographic context." ESRI, *What is GIS?*, https://tinyurl.com/yrc2thv2 (last visited Sept. 24, 2025). GIS information for the City of Saginaw is available online from the

PageID.789. Plaintiff states that he never intended to trespass, destroy property, or provoke arrest. *Id.* Like prior demonstrations, Plaintiff and GOGF set up a table to encourage discussions with officers. *Id.*

Enter Officer Jackson. On July 26, 2020, Defendant Jackson was patrolling his area, which included the FOP. ECF No. 47 at PageID.532. While on patrol, he observed Plaintiff and GOGF setting up and congregating by the edge of the FOP parking lot. *Id.* During this time, he was on the phone with Police Sergeant Oscar Lopez—the FOP's President—discussing an unrelated matter. *Id.* Defendant Jackson informed Sergeant Lopez about the protest, who notified Defendant Jackson that the FOP was private property and requested that the group be removed. *Id.* Defendant Jackson then activated his body camera and recorded the following events.

First, Defendant Jackson, along with Defendant Moore[4] and Officer Kzinowek,[5] exited their vehicles and approached Plaintiff and GOGF's tent and table. ECF No. 47-14 at 1:20. Plaintiff notified Defendant Jackson that he was "[t]here to set up a table for [him]," ostensibly to begin the dialogue that GOGF attempts to engage officers in with their demonstrations. *Id.* at 1:22–30. In response, Defendant Jackson informed Plaintiff that he was on private property and needed to leave. *Id.* Plaintiff replied that his group was not on FOP's property, pointing back behind him to the "right-of-way." *Id.* at 1:33. Defendant Jackson then explained that the area behind Plaintiff is owned by the railroad, and he cannot be there either. *Id.* at 1:36.

---

Saginaw Area GIS Authority. SAGA, *About Our Data*, https://www.sagagis.org/ (last visited Sept. 24, 2025).

[4] It is unclear from the video and the papers whether Defendant Moore and Officer Kzinowek were already on scene, or if Defendant Jackson called in backup before walking over to Plaintiff.

[5] On April 7, 2025, the Parties stipulated to dismiss Officer Kzinowek. ECF. No. 56.

After that, Plaintiff and Defendant Jackson went back and forth about whether Plaintiff and GOGF members were on private or public property. *Id.* at 1:36–2:44. Defendant Jackson ultimately reiterated that he thought that Plaintiff and the group were trespassing and that they needed to leave. *Id.* at 2:50–3:00. Plaintiff turned around to the rest of GOGF members and stated that "they [were] really testing this right-of-way situation," and that he would be "interested in seeing the lines" because "as far as [he] kn[ew,] the right-of-way stops where the sign stops," referring to the property line for FOP. *Id.* at 3:00–15. Plaintiff again asserted that he was not on FOP property; Defendant Jackson again disagreed, at which point Plaintiff began voluntarily moving back a table that he believed was close to FOP property. *Id.* at 3:15–35. Defendant Jackson then asked the group who the leader was, to which Plaintiff and another individual raised their hands. *Id.* at 3:40.

At that point, things escalated. Defendant Jackson asked Plaintiff to "turn around and put [his] hands behind his back," repeating the phrase without Plaintiff's compliance. *Id.* at 3:50–4:07. Instead, Plaintiff struggled, refusing to put his hands behind his back. *Id.* at 4:07–25. During that time, Plaintiff exclaimed that he had been "assaulted by officers before,"[6] he was "very afraid," he had "committed no crime," and the officers were hurting him. *Id.* Defendant Jackson and Officer Kzinowek then wrestled Plaintiff to the ground and handcuffed his left arm. *Id.* at 4:25–38.  Yet Plaintiff climbed to his knees and propped himself with his arms. *Id.* In response, Defendant Jackson kneed Plaintiff four times in the side. *See* Dash Camera at 4:30–40.[7] Defendant Jackson then pressed his hands down on Plaintiff to prevent him from standing up, and Defendant Moore pointed his taser at Plaintiff's back. ECF No. 47-14 at 4:45. Following that, Plaintiff was repeatedly

---

[6] Plaintiff was tasered during a previous encounter with the police during a traffic stop in Shiawassee County in 2017. ECF No. 53-26 at PageID.930–33.

[7] This dash camera footage can be found under ECF No. 53-24. But the footage is compiled under that ECF No. with other sources of footage from Plaintiff's arrest. *See id.* So this Court has used distinct names for the footage compiled under ECF No. 53-24 to clarify the source.

told to put his hands behind his back, and, at one point, Defendant Moore reached for Plaintiff's arm, but Plaintiff pulled away. *Id.* at 4:40–45. Plaintiff also repeatedly pulled his arm away from Officer Kzinowek. *See* Kzinowek Body Camera at 3:50–4:20.

Defendants Jackson, Moore, and Officer Kzinowek then yelled commands at Plaintiff, with Defendant Jackson warning that Plaintiff "will be tased." *Id.* at 4:50–5:00. After that, Defendant Jackson grabbed Plaintiff's cuffed left wrist, attempting to put it behind Plaintiff's back while Plaintiff resisted this effort, while seemingly maintaining his innocence. *Id.* at 5:00–20. Defendant Moore then activated his taser but did not fire it. *Id.* at 5:30. In response, Plaintiff turned around and stated "please don't," referring to Defendant Moore using the taser. *Id.* at 5:30–35. Yet Defendant Jackson directed Defendant Moore to "tase him," and released his grip over Plaintiff's cuffed hand. *Id.* at 5:35.

After Defendant Jackson released his grip on Plaintiff, Plaintiff was no longer struggling with the officers and leaned back on the ground, asking that the officers not tase him. *Id.* at 5:30–53. Plaintiff and Defendant Jackson repeated an exchange, with Defendant Jackson demanding that Plaintiff put his hands behind his back, and Plaintiff pleading with the officers not to tase him and asserting his innocence. *Id.* For the next thirty seconds, the officers persistently directed Plaintiff to "put [his] hands behind his back," and Defendant Moore continued to train his taser on him; Plaintiff reiterated his innocence, still on the ground without physically struggling with the officers. *Id.* at 6:12–45.

Then, Defendant Jackson again instructed Defendant Moore to tase Plaintiff, repeating that instruction twice more. *Id.* 6:47–55. Plaintiff asked Defendant Moore whether he was afraid of Plaintiff, to which Defendant Moore responded by continuing to command Plaintiff to "put [his] hands behind his back." *Id.* at 6:55–7:02. Defendant Moore then tased Plaintiff. *Id.* at 7:03. Plaintiff

began to flail from the tasing, and, though unclear, he seemingly disconnected the taser probes from his arm while rolling on the ground, so Defendant Moore tased him a second time. *Id.* at 7:08. While Plaintiff was still rolling and actively being tased, Defendant Jackson repeatedly yelled at him to "put [his] hands behind his back." *Id.* at 7:10–13. After the second tasing, Plaintiff was on his stomach pleading, "somebody help me." *Id.* at 7:19. Defendant Jackson appeared to reach for Plaintiff's arm, but it is unclear if it is tucked, if Plaintiff pulls away, or if Plaintiff does not move at all. *Id.* at 7:20. In any event, Defendant Jackson exclaimed that he was "still resisting" and Defendant Moore tased Plaintiff a third time—all three tasings thus occurring within seventeen seconds. *Id.*

After the third tasing, Plaintiff curled up in a defensive posture, while Defendant Jackson continued to command him to put his hands behind his back. *Id.* at 7:12–30. Plaintiff replied that he could not move. *Id.* After that, Officer Kzinowek appeared to grab Plaintiff's arm while he was curled, but Plaintiff appeared to attempt to kick her off. *See id.* at 7:39. But a different angle suggests that Plaintiff looked at Officer Kzinowek and asked her to "help [him]," to which she responded, "Ok, give me your hands." *See* Kzinowek Body Camera 6:50–56. Plaintiff was then tased a fourth time. ECF No. 47-14 at 7:40. After the fourth tasing, Defendant Moore firmly placed his hand on Plaintiff's back, preventing him from moving, while Plaintiff was face down on the ground. *Id.* All the while, Defendant Jackson continued to demand that Plaintiff put his hands behind his back. *Id.* at 7:20–40. Plaintiff was then handcuffed and walked to a squad car with wounds on his body. *Id.* at 7:50–8:00; *see also* Kzinowek Body Camera at 7:35–8:10; ECF No. 53 at PageID.791. And at some point during these events, Plaintiff soiled himself and later urinated blood. ECF No. 53 at PageID.791.

The next day, the Saginaw City Council met to discuss both Plaintiff's arrest and the "Blue Flu." *See generally* ECF No. 53-14. On July 28, 2020, the City of Saginaw issued a public statement that supported the officers involved in Plaintiff's arrest. *See* ECF No. 53-15.

In the end, Plaintiff was charged with trespassing, resisting arrest, and obstruction. *See City of Saginaw v. Phelps*, Case No. 20-003219-OM (10th Cir. Ct. Saginaw Cnty., Mich); *City of Saginaw v. Phelps*, Case No. 21-048716-FH (10th Cir. Ct. Saginaw Cnty., Mich). Plaintiff was tried and acquitted of the trespassing charges. *See City of Saginaw v. Phelps*, Case No. 20-003219-OM (10th Cir. Ct. Saginaw Cnty., Mich.). And his remaining charges were dismissed. *See City of Saginaw v. Phelps*, Case No. 21-048716-FH (10th Cir. Ct. Saginaw Cnty., Mich.).

### B. Procedural Background

On June 23, 2023, Plaintiff filed an Amended Complaint, suing the City of Saginaw, FOP, Officer Jackson, Officer Moore, Officer Kzinowek, and Sergeant Lopez. ECF No. 20. The Amended Complaint asserts eight claims—six federal and two state claims: (1) Deprivation of Free Speech and Assembly under the First Amendment (all Defendants); (2) Excessive Force under the Fourth Amendment (all Defendants); (3) False Arrest under the Fourth Amendment (all Defendants); (4) Malicious Prosecution under the Fourth Amendment (all Defendants); (5) Conspiracy to Deprive Plaintiff of his First Amendment Rights (all Defendants); (6) Unconstitutional Policy under *Monell* (City of Saginaw); (7) Assault and Battery under state law (Defendants Jackson, Moore, and Kzinowek); and (8) Malicious Prosecution under state law (all Defendants). *Id.* at PageID.198–209.

On July 17, 2023, Defendants FOP and Sergeant Lopez moved to dismiss the claims against them, ECF No. 28, which was referred to Magistrate Judge Patricia T. Morris, ECF No. 29. Judge Morris issued a report (R&R) recommending that this Court dismiss the claims against FOP and Sergeant Lopez. ECF No. 34. The R&R was adopted on January 1, 2024, dismissing FOP and

Sergeant Lopez. ECF No. 35. On April 7, 2025, the Parties stipulated to dismiss Officer Kzinowek. ECF. No. 56. On February 4, 2025, the remaining Defendants moved for summary judgment. ECF No. 47.

## II.

Summary judgment is proper when no genuine dispute of material fact exists, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if, based on the evidence presented, a reasonable jury could return a verdict for the nonmoving party. *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018). When seeking summary judgment, the movant must identify parts of the record showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The burden then shifts to the nonmovant to "present significant probative evidence that will reveal that there is more than some metaphysical doubt as to the material facts." *Miller v. Maddox*, 866 F.3d 386, 389 (6th Cir. 2017) (cleaned up). Further, the mere existence of a scintilla of evidence supporting the nonmovant's position does not create a genuine dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). And courts need not accept an assertion of fact "blatantly contradicted" by the record. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

At this stage, courts cannot weigh the evidence presented. *Id.* at 249. Nor can courts assess the competency and credibility of witnesses. *Id.* at 255. And courts must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Finley v. Huss*, 102 F.4th 789, 804 (6th Cir. 2024). But where, as here, a video captures the underlying events, "[t]his claimant-friendly standard . . . does not close [courts'] eyes" to the realities of such evidence. *Moore v. Oakland Cnty.*, 126 F.4th 1163, 1167 (6th Cir. 2025). Rather,

courts are "free to assess" video evidence "'in the light depicted by the videotapes.'" *Id.* (quoting *Scott*, 550 U.S. at 381).

## III.

### A. Constitutional Claims Against Defendants Jackson and Moore

The analysis begins with Plaintiff's 42 U.S.C. § 1983 constitutional claims against Defendants Jackson and Moore (Counts I, II, III, IV, and V). Defendants seek summary judgment because, they argue, Plaintiff cannot establish that Defendants Jackson and Moore violated his constitutional rights, and even if she could, they are entitled to qualified immunity. *See generally* ECF Nos. 47; 55.

Where applicable, qualified immunity protects government officials from civil liability. *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). It applies to Plaintiff's § 1983 claims against Defendants Jackson and Moore unless their conduct violated Plaintiff's clearly established constitutional rights. *Finley*, 102 F.4th at 804 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This standard implicates two questions: (1) Did Defendants Jackson and Moore's conduct violate Plaintiff's constitutional rights? (2) If so, were the rights clearly established on July 26, 2020? *See Ortega v. U.S. Immigr. & Customs Enf't*, 737 F.3d 435, 438 (6th Cir. 2013). This Court can address these questions in any order, and "if the answer to either question is 'no,'" then Defendants Jackson and Moore are "entitled to qualified immunity." *Finley*, 102 F.4th at 804–05. When filtered through these questions, only Plaintiff's excessive force claim against Defendant Moore survives summary judgment. Thus, the remaining claims must be dismissed.

### 1. First Amendment Free Speech and Assembly

### a. Constitutional Analysis

Start with Plaintiff's First Amendment claim against Defendants (Count I). To succeed on a First Amendment Claim, a Plaintiff must demonstrate three things:

> (1) that she was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

*Adair v. Charter Co. of Wayne*, 452 F.3d 482, 492 (2006) (*citing Strouss v. Michigan Dep't of Corrections*, 250 F.3d 336, 345 (6th Cir. 2001)).

There is a lack of clarity as to the precise nature of Plaintiff's First Amendment claim. But Defendants argue that, to the extent Plaintiff asserts a retaliatory arrest claim under the First Amendment, that claim is barred because the Defendants had probable cause to arrest Plaintiff, and that Plaintiff's claims are barred by collateral estoppel. ECF No. 47 at PageID.540. Plaintiff does not advance another theory under his First Amendment claims; instead, he opts to dispute Defendant's retaliatory arrest arguments. *See* ECF No. 53 at PageID.792–96. Thus, any other First Amendment theory has been abandoned by the Plaintiff.[8] And because the Court agrees that Defendants had probable cause, there is no need to address their collateral estoppel claims.

---

[8] It appears that Plaintiff may have advanced a standard First Amendment claim in his Amended Complaint. *See* ECF No. 20 at PageID.200 ("Defendants' actions were intended to cause a chilling effect on Plaintiff's protected speech and assembly."). But to the extent that this was Plaintiff's original theory under his First Amendment claims, Plaintiff appears to have abandoned this theory on summary judgment. *See Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[T]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *see also Conner v. Hardee's Food Sys., Inc.*, 65 F. App'x 19, 24 (6th Cir. 2003) (holding that the plaintiff had abandoned a theory of recovery where there was ambiguity in the complaint as to what theory they were advancing under a claim, and on summary judgment did not clearly state, nor supply any support for that theory). Instead, Plaintiff states that "Defendants correctly cite the elements of a First Amendment claim, however, omit any substantive evidence suggesting that Plaintiff has failed to satisfy each element." ECF No. 53 at PageID.792. But Plaintiff then addresses Defendants' arguments regarding probable cause and collateral estoppel, which are irrelevant in a standard First Amendment claim but relevant in a retaliatory arrest claim. *Cf. Adair*, 452 F.3d at 492; *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019) ("[T]he plaintiff pressing a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest."). Thus, because Plaintiff has not provided support for a standard First Amendment claim but *has*

A plaintiff asserting a retaliatory arrest claim must plead and prove the absence of probable cause for the arrest. *Nieves v. Bartlett*, 587 U.S. 391, 402 (2019). "Police officers conduct approximately 29,000 arrests every day—a dangerous task that requires making quick decisions in 'circumstances that are tense, uncertain, and rapidly evolving.'" *Id.* (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). To ensure that officers can execute their duties without apprehension of suit, an officer's conduct is reviewed under an objective standard of reasonableness. *Id.*

When determining if an officer had probable cause for an arrest, the "facts and circumstances within the officer's knowledge [must be] sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Weser v. Goodson*, 965 F.3d 507, 513 (6th Cir. 2020) (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 255 (6th Cir. 2003) (citation and internal quotation marks omitted)). The "probability of criminal activity" is based on a "reasonableness standard" including a 'examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'" *Thacker*, 328 F.3d at 255 (6th Cir. 2003) (quoting *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003)).

The offense for which Plaintiff allegedly committed when he was arrested was criminal trespass. *See City of Saginaw v. Phelps*, Case No. 20-003219-OM, (10th Cir. Ct. Saginaw Cnty., Mich). Criminal trespass is defined by the City of Saginaw's Code of Ordinances as:

No person shall willfully and without lawful authority:

(A)  Enter upon the lands or premises of another after having been forbidden to do so by the owner, occupant, person in control thereof, or the agent or servant of the owner, occupant, or persons in control thereof; or

---

argued against Defendant's arguments about a retaliatory arrest claim, the Court will treat it as such.

(B)   Being upon the premises of another neglect or refuse to depart therefrom after being notified to do so by the owner, occupant, person in control thereof, or agent or servant of the owner, occupant, or person in control thereof.

Sag. Cnty. Ordinance § 130.29 CRIMINAL TRESPASS. Therefore, to have had probable cause to arrest Plaintiff, Defendants Jackson and Moore had to reasonably believe, based on the facts and circumstances known to them at the time of arrest, that Plaintiff entered or remained on FOP property without the organization's consent.

Here, Defendants Jackson and Moore could reasonably have believed that Plaintiff was on FOP property when he refused to leave. Defendants Jackson and Moore testified that they believed Plaintiff was trespassing at the time of the arrest. *See* ECF Nos. 47-3 at PageID.607; 47-6 at PageID.657. Both Plaintiff and Defendants acknowledge that Defendant Jackson spoke with Sergeant Lopez about the demonstrators in front of FOP, and that Sergeant Lopez asked Defendant Jackson to remove them. ECF Nos. 53 at PageID.789; 47 at PageID.533. Moreover, when Defendant Jackson arrived at the protest, he immediately told Plaintiff that he was trespassing and needed to leave. ECF No. 47-14 at 1:33. Indeed, Defendant Jackson and Plaintiff got into an argument in which Plaintiff contended that he was in a "right-of-way," but Defendant Jackson points behind him and argues, "that is, this is not," referencing where both Plaintiff and GOGF stood. *Id.* at 1:30–36. In fact, Plaintiff was told six times that he was trespassing and needed to leave before Defendant Jackson initiated his arrest. *See id.* at 1:45, 2:26, 2:27, 2:35, 2:46, 2:51. At bottom, Defendant Jackson's conversation with Plaintiff and the record testimony establishes that Defendants Jackson and Moore *believed* that Plaintiff was on private property, even though the property was, in fact, public.

Plaintiff argues that Defendants' belief that he was on private property was not reasonable because of the readily available information that would have demonstrated that the property was public. Indeed, when determining if probable cause exists, an officer "cannot look only at the

evidence of guilt while ignoring all exculpatory evidence. Rather, the officer must consider the totality of the circumstances, recognizing both the inculpatory and exculpatory evidence, before determining if he has probable cause to make an arrest." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). Further, facts learned by officers on the scene can negate a finding of sufficient probable cause for arrest. *See Williams v. Maurer*, 9 F.4th 416, 429 (6th Cir. 2021).

Phelps asserts two reasons why it should have been clear to Defendants that he was on public property: (1) because there was easily accessible GIS information that would have proven that he was on public land; and (2) because the area passed the "public eye test." But things are not so simple.

True, Defendant admits that he was aware of the GIS data but did not review it that day. ECF No. 47-3 at PageID.603. But it is not clear that, even if Defendants had reviewed the GIS information, it would have been helpful to them. In fact, when shown the GIS information during his deposition, Defendant Jackson could not easily point out whether Plaintiff was within the public area or on FOP property:

> Q. You think he was inside of this area?
>
> A. He was not inside the parking lot, no.
>
> Q. Okay. But you think he was inside of this blue line?
>
> A. I can't say that, sir. I mean, I don't know how thick that line is *in reference to how many feet it is in real life*, so I can't say that for sure.

*Id.* at PageID.603 (emphasis added).

Defendant Jackson's confusion is best exemplified by the actual GIS image:



ECF No. 53-10. From the image, it is unclear exactly where the blue line defining FOP's property stops and where the public property area begins, especially when considering that the railroad tracks immediately behind where Plaintiff and GOGF were stationed were private property. In fact, it was so difficult to judge where FOP property ended and public property began that Plaintiff needed an expert witness to prove where the property line was at his criminal trial. *See* ECF No. 47-11. And that expert witness called the property line a "real unique situation," *id.* at PageID.709, and explained some of the ambiguity when assessing whether Plaintiff was on public land or not:

> Q: Mr. Morey, would it help you to demonstrate on this diagram where you're talking?
>
> A: So the center line of Niagara Street is indicated with the Niagara Street shown right here. The physical center of the platted road right-of-way is only six feet off of the centerline of the rail. And so what the does is it leaves a strip of land 26 feet between the center of the railroad track and the actual property line, which is a lot larger than normal. The road typically is a wider road. This road is only 23 feet wide, they're typically 27. The road was kind of pinched in there to fit within that road right-of-way. That's what left the – a larger than normal grassed, I guess we'll

call it grass area, right-of-way area between the actual property line of block 68 and
the physical center line of Niagara Street.

*Id.* at PageID.706.

Next, Plaintiff argues that the area where he and GOGF were located passed the "public

property eye test." ECF No. 53 at PageID.794. But Plaintiff does not provide legal authority to

support the assertion that such a test even exists as a factor in determining probable cause. *Id.* So

this Court will not dwell on the point.

Plaintiff also argues that, even if Defendants Jackson and Moore had probable cause to

arrest him, the *Nieves* exception should apply. In *Nieves*, the Supreme Court announced the

following:

> Although probable cause should generally defeat a retaliatory arrest claim, *a
> narrow qualification is warranted for circumstances where officers have probable
> cause to make arrests, but typically exercise their discretion not to do so.* In such
> cases, an unyielding requirement to show the absence of probable cause could pose
> "a risk that some police officers may exploit the arrest power as a means of
> suppressing speech."

587 U.S. at 406 (quoting *Lozman v. Riviera Beach*, 585 U.S. 87, 99 (2018)) (emphasis added). The

Court concluded that the "no-probable-cause requirement should not apply when a plaintiff

presents *objective evidence* that he was arrested when otherwise similarly situated individuals not

engaged in the same sort of protected speech had not been." *Id.* at 407 (emphasis added). The Court

later clarified that "although the *Nieves* exception is slim, the demand for virtually identical and

identifiable comparators goes too far." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024). But the

evidence must *still be objective* to prove that a plaintiff has been arrested in a situation in which

similarly situated people are not, otherwise there is the possibility for "the significant problems

that would arise from reviewing police conduct under a *purely subjective* standard." *Id.* (emphasis

added) (quoting *Nieves*, 587 U.S. at 407).

Plaintiff provides no objective evidence to support his assertion that similarly situated people are not arrested for trespass when suspected of being on private property. Instead, he broadly asserts as evidence "the extensive citizenry who wander public property each day without being arrested, beaten, or exhaustively, prosecuted for charges after it is factually confirmed their purported crime, here trespassing, was indeed completely baseless." ECF No. 53 at PageID.795. This accusation is not objective evidence and offers a "purely subjective standard" that *Nieves* denounced. 587 U.S. at 407. Without objective evidence, such as surveys of arrests made for trespassing on public lands, *see Gonzalez*, 602 U.S. at 658, or statistics or other information about how these violations are generally charged, *see Brown v. City of Albion, Michigan*, 136 F.4th 331, 341 (6th Cir. 2025), Plaintiff has not demonstrated that similarly situated individuals are not arrested. Thus, the *Nieves* exception does not apply.

Alternatively, Plaintiff asks this Court to recognize an additional exception in the narrow circumstances where: "the arresting officer, who days earlier protested the firing of a colleague due to excessive force, initiates contact with a(sic) oblivious private property owner, to inform them that protestors against police violence are at his property, and urges them to have them removed." ECF No. 53 at PageID.795 (emphasis omitted). But *Nieves* was clear that a finding of probable cause should generally defeat a retaliatory arrest claim, and that *Nieves* represents a narrow qualification against that principle. 587 U.S. at 406. It makes little sense for this Court to create a new exception that would seemingly only apply to Plaintiff's case. Further, Plaintiff offers no case law supporting this exception. Thus, this Court will not apply his suggested exception. As a result, both Defendants Jackson and Moore had probable cause to arrest Plaintiff for trespass, and no exception applies.

**b. Clearly Established**

Even if Plaintiff could establish that Defendants did not have probable cause to arrest him, Defendants are entitled to qualified immunity because the conduct was not clearly established as unconstitutional when they arrested Plaintiff on July 26, 2020. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (cleaned up). This standard "protects 'all but the plainly incompetent or those who knowingly violate the law.'" District of *Columbia v. Wesby*, 583 U.S. 48, 63 (2018). And plaintiffs bear "the burden of showing that the right was clearly established." *Bell v. City of Southfield*, 37 F.4th 362, 367 (6th Cir. 2022).

To meet their burden, plaintiffs must show that existing law places the "official's conduct 'beyond debate' such that any reasonable official would understand that [his] conduct was unlawful." *Finley*, 102 F.4th at 808 (cleaned up). Generally, this means plaintiffs must provide an "on-point" Sixth Circuit or Supreme Court "case showing that reasonable officers would have known their actions were unconstitutional under the specific circumstances they encountered." *Bell*, 37 F.4th at 367–68 (emphasis added); *see also Chaney-Snell*, 98 F.4th at 720 ("In the fact-dependent excessive-force context," this test "requires a plaintiff to identify a highly specific right or a case with analogous facts."). And "[b]ecause unpublished cases are nonbinding, 'a plaintiff cannot rely on an unpublished decision to meet his burden' of showing that a right is clearly established." *Ennes v. Presque Isle Cnty.*, 773 F. Supp. 3d 400, 420 (E.D. Mich. 2025) (quoting *Bell*, 37 F.4th at 367).

Plaintiff cites two cases, *Gardenshire* and *Williams*. Generally, those cases involved situations in which officers learned new information at the scene, casting doubt on whether probable cause existed. But both cases are distinguishable.

Start with *Gardenshire*. In *Gardenhire*, a couple who owned a store was switching storefronts with another neighboring store. *Gardenshire*, 205 F.3d at 308. Midway through the switch, the neighbor reported some of her merchandise missing, which the police could plainly see in the couple's store window because they were exchanging storefronts. *Id.* In the process of taking the couple in for questioning, the officers acknowledged that it would be "foolish" for someone to steal merchandise and then display it in the next-door window in plain view. *Id.* at 309. The Sixth Circuit held that a reasonable jury could find that the officers lacked probable cause. *Id.* at 318.

Here, Plaintiff's arrest is dissimilar to *Gardenshire*. Unlike *Gardenshire*, the information the Defendant officers learned at the scene here was not clearly contradictory to what they initially believed, *e.g.*, that Plaintiff was on FOP property. To that end, the dividing line between public and FOP property is not clear on the GIS, and certainly in person, it would have been difficult to determine whether Plaintiff was correct in his assertion that he was on public property, especially when it was only supported by Plaintiff's word. Further, the Sixth Circuit in *Gardenshire* emphasized that they did not intend to add a "duty to investigate" to the probable cause analysis, just that "an officer cannot look only at the evidence of guilt while ignoring all exculpatory evidence." *Id.* During Plaintiff's arrest, there was no clear exculpatory information that would contradict the officer's belief that Plaintiff was on FOP property at the time of his arrest.

Turn to *Williams*. In *Williams*, an anonymous caller to 9-1-1 reported that someone had burst into their neighbor's residence and that they had heard fighting between a man and a woman. 9 F.4th at 423. The caller stated that they heard the intruder "break the glass" and believed that the apartment door had been kicked in. *Id.* But when the officers arrived, they determined that the window was not a point of entry, that there was no sign of forced entry on the apartment door, and that, while they did hear screaming, it did not appear to be coming from the apartment the caller

identified. *Id.* Despite the lack of evidence that a crime occurred at the apartment, the officers continually knocked on the door, and when the plaintiff answered, despite the officers noticing no signs of suspicious activity or bruising on the plaintiff, the officers pushed into her house, injuring her. *Id.* at 424. After that, the plaintiff's boyfriend came out of the bedroom, and an argument ensued between him and the officers, during which he was tackled and arrested. *Id.* at 425. The Sixth Circuit held that a jury could find that the officers lacked probable cause. *Id.*at 437.

Yet *Williams* is far from Plaintiff's case. First, the officers in *Williams* received a second 9-1-1 call from the same anonymous caller before intruding on the plaintiff's apartment, indicating they were no longer certain where the alleged screaming was coming from, undermining the reason for the officer's entry before they even began speaking with the plaintiff. *Id.* at 433. That was not the case in Plaintiff's arrest, where there was no "concrete evidence" before interacting with Plaintiff that he was not on FOP property. Second, in *Williams*, there was little evidence, if any at all, that there had been a disturbance at the plaintiff's apartment, and in fact, the officers even acknowledged that the yelling did not appear to come from the same apartment that the caller identified. *Id.* at 433–34. But in Plaintiff's case, the evidence was not clear that he was on public property. In fact, by all accounts, Defendants Jackson and Moore genuinely believed that Plaintiff was trespassing on private FOP property. *See* ECF No. 47-3 at PageID.607; ECF No. 47-6 at PageID.657. And Defendant Jackson explained that *in real life*, it is much harder to judge whether the Plaintiff was on public or private land. *Id.* at PageID.603 ("I can't say that, sir. I mean, I don't know how thick that line is in reference to how many feet it is in real life, so I can't say that for sure.") (emphasis added). Because there was no easily identifiable evidence at the scene which would have indicated to either Defendant Jackson or Moore that Plaintiff was on public and not FOP land, Defendants could conclude that there was probable cause that Plaintiff committed a

crime after an 'examination of all facts and circumstances within an officer's knowledge at the time of an arrest.'" *Thacker*, 328 F.3d at 255 (6th Cir. 2003).

Lastly, Plaintiff cites *Adams v. Blout County*, seemingly not to show that either Defendants Jackson or Moore's conduct was clearly established as constitutional, but that the Defendants' arguments for probable cause rest on their version of the facts alone, and thus that the Plaintiff's First Amendment claims must survive summary judgment. 946 F.3d 940, 950–51 (6th Cir. 2020) ("When raising his legal argument, however, [the officer] fails to concede the most favorable view of the facts to Plaintiffs and instead relies solely on his version of the facts, as addressed above."); *see* ECF No. 53 at PageID.794. But Plaintiff cannot demonstrate a dispute of material fact as to whether either Defendant *believed* that he was on public property. First, as noted before, both Defendants testified that they believed that Plaintiff was on FOP property. Second, Plaintiff alleges that Defendant Jackson "previously viewed the GIS map of the property, which clearly showed the area as being separate from the FOP lodge." ECF N0. 53 at PageID.793. As this Court has noted earlier, the image is not explicitly clear on where the FOP property ends and where the grass begins. *See supra* Section III.A.1.a. In addition, Plaintiff is incorrect in his assertion that Defendant Jackson admitted to seeing the GIS map of the FOP property. Indeed, Defendant Jackson noted explicitly that he had not checked the GIS information before Plaintiff's arrest on July 26, 2020. ECF No. 53-27 at PageID.1068.

Lastly, in *Adams*, the Sixth Circuit held that it could not reach the merits of the defendant's qualified immunity arguments because there was a dispute as to facts as to those arguments, so the Sixth Circuit dismissed the case for lack of jurisdiction. *Adams*, 946 F.3d at 951. To the extent Plaintiff cites *Adams* to show that Defendant's conduct was clearly established, a case in which the merits are not reached cannot clearly establish the law. *See Kanuszewski v. Michigan Dep't of*

*Health & Hum. Servs.*, 927 F.3d 396, 423 (6th Cir. 2019) (holding that defendants were entitled to qualified immunity because the Sixth Circuit failed to reach the merits of a case that would have clearly established the right at issue).

In sum, Plaintiff failed to establish a genuine dispute of material fact as to whether Defendant Jackson or Moore lacked probable cause or locate an analogous case that clearly establishes that the Defendants' conduct was unconstitutional. Thus, Defendants are entitled to summary judgment on Plaintiff's First Amendment claims.

### 2. Fourth Amendment Excessive Force

Turn to Plaintiff's Fourth Amendment excessive force claims against Defendants Jackson and Moore. The Fourth Amendment protects people from "unreasonable searches and seizures." *Vanderhoef*, 938 F.3d at 276 (citing U.S. CONST. AMEND. IV). An officer using excessive force constitutes an unreasonable seizure, thus violating the Fourth Amendment. *Id.* And where "more than one officer is involved, the court must consider each officer's entitlement to qualified immunity separately." *Wright v. City of Euclid*, 962 F.3d 852, 865 (6th Cir. 2020).

First, Plaintiff argues that Defendant Jackson used excessive force when knee striking Plaintiff while he was on the ground. ECF No. 53 at PageID.801. Second, Plaintiff contends that Defendant Moore used excessive force when he tased Plaintiff to effectuate the arrest. *See id.* at PageID.802. Each claim is addressed below.

### a. Defendant Jackson

Begin with Plaintiff's excessive force claim against Defendant Jackson. For the reasons stated below, this claim lacks merit.

### *i. Constitutional Analysis*

Fourth Amendment jurisprudence "has long recognized that the right to make an arrest . . . necessarily carries with it the right to use some degree of physical" force "to effect it." *Graham*,

490 U.S. at 396. To determine whether an officer's degree of force was excessive, courts ask whether the force used was objectively reasonable. *VanPelt v. City of Detroit*, 70 F.4th 338, 340 (6th Cir. 2023). In so doing, courts must not apply the "20/20 vision of hindsight" from the "comfort of their chambers." *Id.* (cleaned up). When push comes to shove, not "every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. *Graham*, 490 U.S. at 396. Courts must instead consider the perspective of a reasonable officer on the scene, understanding that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary." *Id.* at 396–97.

Adopting that perspective, courts must analyze "whether the totality of the circumstances justifies a particular level of force." *Coffey v. Carroll*, 933 F.3d 577, 588 (6th Cir. 2019). Three non-dispositive factors guide this analysis: (1) the severity of the crime at issue, (2) the immediacy of the threat the suspect posed to the safety of the officer or others, if any, and (3) the suspect's active resistance or evasion, if any. *Wright*, 962 F.3d at 865. Many cases "rise and fall with the third factor." *Shanaberg v. Licking Cnty.*, 936 F.3d 453, 456 (6th Cir. 2019). But at day's end, the analysis is "context-sensitive," and courts "must consider all the relevant circumstances" known to the officers, "including facts and events leading up to the climactic moment" of force. *Barnes v. Felix*, 145 S. Ct. 1353, 1356–59 (2025). Put differently, an officer's use of force "cannot be hermetically sealed off from the context in which [it] arose." *Id.* at 1358 (citation modified). And "[t]aking account of that context may benefit either party in an excessive-force case." *Id.* After all, [p]rior events may show," why "a reasonable officer would have perceived otherwise ambiguous conduct . . . as threatening." *Id.*

Here, Defendant does not argue either of the first two factors, which both appear to favor the Plaintiff. But as explained below, the third factor favors the Defendant. So Defendant Jackson's knee strikes were reasonable.

*Severity of the crime.* Consider first the severity of the crime. This factor favors Plaintiff. In assessing the severity of a plaintiff's crime, the Sixth Circuit has analyzed several relevant factors: whether (1) the plaintiff was suspected of or committed a felony or a misdemeanor—felonies are, at the very least, moderately severe; (2) the plaintiff was violent—violent offenses are more severe than others; (3) the plaintiff was suspected of being involved in an underlying crime—compounding offenses can increase the severity; (4) the officers were responding to an emergency call or the plaintiff was otherwise exacerbating public safety concerns. *See Shumate v. City of Adrian*, 44 F.4th 427, 440–42 (6th Cir. 2022) (collecting cases).

None of these factors indicates that Plaintiff's crime was severe. First, Plaintiff's criminal trial record shows that he was charged with a misdemeanor trespass. *See City of Saginaw v. Cornelius Edgar Phelps*, Case No. 20-003219-OM, (10th Cir. Ct. Saginaw Cnty., Mich). Plaintiff was not acting violently when he was arrested; he remained calm until Defendant Jackson told him he was being arrested for trespassing. *See* ECF No. 47-14. Plaintiff was not suspected of involvement in any underlying crime beyond the trespass, and Defendant Jackson was not responding to an emergency call; instead, he came upon Plaintiff during his routine patrol. ECF No. 47 at PageID.532–533. Thus, the severity of the crime does not indicate the need for considerable force.

*Immediacy of the threat.* Shifting to the second factor, Plaintiff did not pose an immediate threat to Defendant Jackson. This was not a situation where Plaintiff was "particularly violent or physically resistant, so as to endanger responders." *Kent v. Oakland Cnty.*, 810 F.3d 384, 391 (6th

Cir. 2016); *cf. Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 94 (6th Cir. 2012) (plaintiff ran from police while "flailing his arms violently"); *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012), 695 F.3d at 511 (plaintiff was "out of control and [ ] forcefully [ ] resist[ing] arrest"). Defendants do not identify any actions in which Plaintiff attempted to hit either Defendant Jackson or Moore. *See Rudlaff v. Gillispie*, 791 F.3d 638, 640 (6th Cir. 2015) (finding tasing reasonable where claimant "puffed out his chest and stared down [the officer]," then swung his arms twice toward officers). Rather, Plaintiff had a conversation with Defendant Jackson up until the moment when Defendant Jackson attempted to handcuff him for trespass. *See* ECF No. 47–14. Thus, the moments before Plaintiff's arrest do not indicate that he was an immediate threat to Defendant Jackson or himself.

**Degree of resistance or evasion.** Moving to the third factor, the degree of Plaintiff's resistance or evasion, this factor supports the proposition that Defendant Jackson used objectively reasonable force. Relevant here, the Sixth Circuit generally places resistance into two categories: passive and active. *See Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015). And this distinction matters because the category of resistance affects the amount of force an officer may use to arrest someone. *See Chaney-Snell v. Young*, 98 F.4th 699, 717–18 (6th Cir. 2024) (concluding that dating back to the English common-law, the amount of force an officer could use to effectuate an arrest depended on an arrestee's degree of resistance) (collecting sources).

People passively resist when, without using "overtly threatening language," they are verbally uncooperative, insulting, or argumentative. *Shumate*, 44 F.4th at 447–48; *see also Goodwin*, 781 F.3d at 323–24. In other words, passive resistance "entails a lack of physical resistance," flight, or verbal threats. *King v. City of Rockford*, 97 F.4th 379, 396 (6th Cir. 2024) (citation modified). When someone passively resists, officers may use minimal force to carry out

an arrest, so long as the force is not "gratuitous." *See Chaney-Snell*, 98 F.4th at 715 (collecting cases); *Gambrel v. Knox Cnty.*, 25 F.4th 391, 402 (6th Cir. 2022) (noting that where, as here, "officers have the right to arrest a suspect for committing a crime . . . they may use some force to carry out the arrest"). For example, officers may grab a person's arms to effectuate an arrest, control an uncertain situation, ensure compliance, or escort an arrestee to their patrol vehicles. *See, e.g., Smith v. City of Wyoming*, 821 F.3d 697, 718 (6th Cir. 2016); *Slusher v. Carson*, 540 F.3d 449, 455 (6th Cir. 2008); *Robinson v. City of Knoxville*, No. 24-5159, 2025 WL 621451, at *8 (6th Cir. Feb. 26, 2025); *Bolden v. City of Euclid*, 595 F. App'x 464, 470 (6th Cir. 2014). But they may not use substantial force like tasers or strikes when someone passively resists. *See, e.g., Goodwin*, 781 F.3d at 323–28; *Shumate*, 44 F.4th at 447; *Wright*, 962 F.3d at 871.

By contrast, one actively resists arrest "by physically struggling with police, threatening them, resisting handcuffs, or acting erratically." *Moore*, 126 F.4th at 1168. When someone actively resists officers, officers may use substantial force—like compliance strikes (kicking, kneeing, and punching to secure compliance), muscling techniques (including takedowns), tasers, batons, and pepper spray—to arrest the person. *See, e.g., Rudlaff v. Gillispie*, 791 F.3d 638, 641–43 (6th Cir. 2015) (taser or knee strikes); *King*, 97 F.4th at 396 (same); *Moore*, 126 F.4th at 1168 (collecting cases); *Ennes*, 773 F. Supp. 3d at 418 (collecting cases). But an officer must reduce the amount of force that they use to no force or minimal, non-gratuitous force once a suspect is neutralized or ceases to actively resist. *See Gambrel*, 25 F.4th at 402.

Plaintiff was actively resisting arrest when Defendant Jackson administered the knee strikes; thus, this factor strongly favors Defendant Jackson. First, an officer's use of force "cannot be hermetically sealed off from the context in which [it] arose." *Barnes v. Felix*, 145 S. Ct. 1358. Thus, the Court must look to the moments immediately before Defendant Jackson administered

- 25 -

the knee strikes. The video evidence from the patrol car dash cam shows Plaintiff physically struggling while Defendant Jackson attempts to arrest him for trespass. Defendant Jackson Dash Cam 4:30–40. While on the ground, Plaintiff struggled to prevent Defendant Jackson and Officer Kzinowek from grabbing his arms and arresting him, and, even when they did have a grasp of his wrists, he continually pulled them away from both officers. Kzinowek Body Cam 3:50–4:50. Because Plaintiff is both struggling with the police and resisting handcuffs in the moments leading up to Defendant Jackson's knee strikes, *Moore*, 126 F.4th at 1168, Plaintiff is resisting arrest, and the strikes were not excessive. *See Rudlaff*, 791 F.3d at 642 ("When a suspect actively resists arrest, the police can use a taser (or a knee strike) to subdue him"). Thus, Defendant Jackson's knee strikes did not violate Plaintiff's Fourth Amendment rights against excessive force.

Next, Plaintiff argues in the alternative that it was lawful for him to resist an unlawful arrest. "The right to resist unlawful arrests, and other unlawful invasions of private rights, is well established in [Michigan] common law." *People v. Moreno*, 491 Mich. 38, 46–47, 814 N.W.2d 624, 628 (2012). Under this theory, one may use such force as reasonable, "the basis for such preventive or resistive action is the illegality of an officer's action, to which [a] defendant immediately reacts." *Id.* (quoting *People v. Krum*, 374 Mich. 356, 361, 132 N.W.2d 69, 72 (1965)). But under Michigan law, Plaintiff has a right to resist arrest only if Defendants lacked probable cause, which the Court has already determined they did.  *See Jones v. Naert*, 121 F.4th 558, 565 (6th Cir. 2024), reh'g denied, No. 23-1056, 2024 WL 5398777 (6th Cir. Dec. 11, 2024). Thus, Plaintiff's unlawful arrest argument is inapplicable.

### *ii. Clearly Established Analysis*

Even if Defendant Jackson used excessive force to arrest Plaintiff, it was not clearly established on July 26, 2020, so he is entitled to qualified immunity.

Plaintiff has not met his burden. First, it is unclear which cases Plaintiff believes support each of his different §1983 claims because he has not specified which cases apply, and instead "directs the Court to the cases cited earlier herein, demonstrating the alleged violations were clearly established." ECF No. 53 at PageID.810. Thus, the Court will review all cases Plaintiff cites that could potentially point to clearly established law. Second, the Sixth Circuit has held that officers can both administer knee strikes *or* tase a suspect if they resist arrest. *See Rudlaff*, 791 F.3d at 642. Thus, this Court will analyze both cases in which either a knee strikes or a taser were administered in response to a suspect's resistance.

One such case is *Shumate*. But *Shumate* is inapposite. In *Shumate*, the officer used force *before* the plaintiff resisted arrest, unlike Defendant Jackson's knee strikes, which came after Plaintiff resisted arrest.  *See Shumate*, 44 F.4th at 435. Further, the plaintiff in *Shumate* was tased in part because he failed to readily offer his arms for cuffing, which the Sixth Circuit argued was not active resistance allowing force because it did not involve "'kicking, flailing, and wriggling away from [the officers'] grasp.'" *Id.* at 448 (quoting *Roell v. Hamilton Cnty.*, 870 F.3d 471, 482 (6th Cir. 2017)). But both Defendant Jackson's and Officer Kzinowek's body cameras show Plaintiff actively seeking to remove his hands from each officer's grasp, so that he may not be cuffed. Thus, *Shumate* is distinguishable.

Indeed, several cases that Plaintiff believes clearly establish that Defendant Jackson's knee strikes were excessive are distinguishable because the force in those cases was administered before physical resistance, not after, like this case. *See Wright*, 962 F.3d at 868 (6th Cir. 2020) (holding that there remained a dispute as to material fact whether tasing the plaintiff was excessive because he was not resisting arrest when he attempted to maneuver his body in his seat to comply with the officer's command for him to exit his vehicle); *LaPlante v. City of Battle Creek, Michigan*, 30 F.4th

572, 580–581 (6th Cir. 2022) (holding that a jury could find that the plaintiff was not actively resisting when he put his hands in the air in response to the officer's request that he put them behind his back); *Kent v. Oakland Cnty.*, 810 F.3d 384, 391–392 (6th Cir. 2016) (holding that a person is not actively resisting arrest when they have obtained a submissive posture by putting their hands in the air and their back on a wall); *Saalim v. Walmart, Inc.*, 97 F.4th 995, 1006 (6th Cir. 2024) (holding that the plaintiff was only passively resisting when he turned around to face the officer and did not readily present his hands); *King v. City of Rockford, Michigan*, 97 F.4th 379, 396 (6th Cir. 2024) (holding that a reasonable jury could find that the plaintiff was passively resisting because he only turned away from the officer while being handcuffed and there was no sign of the plaintiff being physically hostile or using force against the officer); *Brown v. Lewis*, 779 F.3d 401, 418 (6th Cir. 2015) (finding it excessive to pull the plaintiff from her vehicle when she had been compliant with every command from the officers); *Vanderhoef*, 938 F.3d at 278 (holding that the plaintiffs were not actively resisting because they complied with all of the officer's commands); *cf. Rudlaff*, 791 F.3d at 642 (holding that the officers did not use excessive force in response to a Plaintiff swinging his arms in the officer's direction, locking up his body, and refusing to give the officer's his hands, all in an attempt to prevent officers from cuffing him).

Second, several of the cases are further distinguishable because the plaintiffs in those cases were never told they were under arrest before force was used against them. *See Wright*, 962 F.3d at 868 ("Finally, and significantly, at no point before Flagg deployed his taser was Wright under arrest for any offense."); *Smith v. City of Troy, Ohio*, 874 F.3d 938, 945 (6th Cir. 2017) ("Moreover, Osting never told Smith that he was under arrest, and there is a factual dispute as to whether Smith actually resisted Osting before Osting took him to the ground, or whether Smith merely failed to comply with Osting's order to return to the car."); *LaPlante*, 30 F.4th at 580 ("In fact, Plaintiff

claims that he had not been told that he was being arrested at [the time force was used]"); *Kent*, 810 F.3d at 390 (finding that the plaintiff was never told he was under arrest and that this was "one important consideration in the totality-of-the-circumstances analysis, and it weighs in [the plaintiff's] favor."); *Saalim*, 97 F.4th at 1005 ("As an initial matter, this Court has held that when an officer has not told an individual that he is under arrest, this enhances the likelihood of a finding of excessive force.").

Third, three cases cited by Plaintiff are unpublished Sixth Circuit opinions. *See Galinis v. Cnty. of Branch*, 660 F. App'x 350 (6th Cir. 2016); *Kelly v. Sines*, 647 F. App'x 572 (6th Cir. 2016); *Kijowski v. City of Niles*, 372 F. App'x 595 (6th Cir. 2010). But in *Bell*, the Sixth Circuit held that unpublished cases could not "clearly establish" law because they are not "existing *precedent*" and are not binding on future panels. 37 F.4th at 367–68. Thus, these cases cannot be used to clearly establish that Defendant's knee strikes represented excessive force.

Fourth, several of the cases Plaintiff cites were published *after* the date of his arrest on July 26, 2020. *See Shumate*, 44 F.4th 427; *LaPlante*, 30 F.4th 572; *Saalim*, 97 F.4th 995; *King*, 97 F.4th 379. But "a Government official's conduct violates clearly established law when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" that every "reasonable official would [have understood] that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). So these cases published *after* Plaintiff's arrest are not clearly established precedent.

Lastly, Plaintiff includes *Ames*. But this is a decision from the Ninth Circuit. 846 F.3d 340 (9th Cir. 2017). This precedent from outside the Sixth Circuit is not controlling authority because it does not bind the Sixth Circuit. *See Wilson v. Layne*, 526 U.S. 603, 604 (1999); *see also Ashcroft*, 563 U.S. 731, 746 (Kennedy, A., Concurring) (explaining that qualified immunity is lost when

plaintiffs point to controlling authority *within their jurisdiction*). Thus, *Ames* does not clearly establish that Defendant Jackson's conduct constituted excessive force.

At bottom, Defendant Jackson's knee strikes did not constitute excessive force. And even if they did, Defendant Jackson is entitled to qualified immunity. So Plaintiff's excessive force claim against Defendant Jackson fails.

### b. Defendant Moore

Unlike the claim against Defendant Jackson, Plaintiff's excessive force claim against Defendant Moore survives summary judgment.

### i. Constitutional Analysis

The first two *Graham* factors, the severity of the crime and the immediacy of the threat, remain the same: Plaintiff's crime was not a felony, and he was not an immediate threat to Defendant Moore.[9] But unlike Defendant Jackson, the third factor—the degree of resistance or evasion—does not favor Defendant Moore.

By the time Defendant Moore tased Plaintiff the first time, he was on his back with his hands up near his chest, palms facing out—in a defensive posture. Kzinowek Body Cam 5:23–6:23. An officer must reduce the amount of force that they use to no force or minimal, non-gratuitous force once a suspect is neutralized or ceases to actively resist. *See Gambrel*, 25 F.4th at

---

[9] Defendant Moore contends that Plaintiff could have used the loose handcuff as a weapon, ECF No. 47 at PageID.544; ECF No. 47-6 at PageID.656, and that Plaintiff was less than a foot away from the gun at his ankles. ECF No. 47 at PageID.545; ECF No. 47-6, PageID.664–65. But the clearest video of Plaintiff's hands does not show him attempting to use the loose handcuff as a weapon. *See generally* Kzinowek Body Cam.  Second, Defendant Moore was not sure if the gun at his ankle was even visible. ECF No. 47-6 at PageID.665. Indeed, a clear image of Defendant Moore's ankles shows that his additional firearm was *not* visible. *Id.* at 5:02. Even if there was a slight possibility that Plaintiff was aware of the firearm on Defendant Moore's ankle, Plaintiff is never shown reaching for it. *See id.*  Plaintiff does not appear to have been an immediate threat to Defendant Moore.

402; *see also Shreve v. Jessamine Cnty. Fiscal Ct.*, 453 F.3d 681, 688 (6th Cir. 2006) ("clearly established in 1991 the unconstitutionality of the use of gratuitous force against helpless and incapacitated suspects during arrest.").

In that vein, plaintiffs are not actively resisting and thus cannot be subject to substantial force while they are putting their hands in the air. *See, e.g.*, *Kent*, 810 F.3d at 391 ("But once [plaintiff] ceased flailing his arms and assumed [the posture of putting his hands up and having his back against the bedroom wall], he indicated submission or, at the very least, minimized any immediate safety threat he might have posed to the deputies and emergency responders in the bedroom."); *LaPlante*, 30 F.4th at 58 (finding a genuine dispute of material fact as to whether plaintiff actively resisted arrest when, although plaintiff "moved his hands in the air just as [the officer] was about to handcuff him," it was unclear whether he was surrendering or resisting); *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607–08 (6th Cir. 2006) (holding that qualified immunity is inappropriate where there is a dispute regarding whether a suspect stopped and raised his hands in the air during a police encounter, and a reasonable jury could conclude that the suspect's movements indicated that he had surrendered); *Correa v. Simone*, 528 F. App'x 531 (6th Cir. 2013) (finding no immediate threat of harm, and ultimately finding excessive force, where arrestee—who was armed—had put his hands in the air, ceased resisting, and made no evasive movements); *Thomas v. Plummer*, 489 F. App'x 116, 126 (6th Cir. 2012) (finding that arrestee who had dropped to her knees and raised her hands over her head posed "absolutely no threat to [the officer's] or any other officer's safety"); *Grawey v. Drury*, 567 F.3d 302, 311 (6th Cir. 2009) (finding a constitutional violation when the plaintiff originally ran for the officer, but stopped and placed his hands against a wall, yet was still pepper sprayed.). Thus, because Plaintiff was no longer resisting at the time of the first tasing, Defendant Moore's actions violated the Constitution.

Defendant Moore's repeated tasings also violated the Constitution. In *Smith*, for example, the Sixth Circuit held that tasing the plaintiff for 48 seconds in two minutes prevented him from complying with the officer's commands. 874 F.3d at 946 ("[I]t was clearly established at the time of the incident in this case that a police officer violates a suspect's right to be free from excessive force by repeatedly tasing the suspect without giving him a chance to comply with orders."); *Kent*, 810 F.3d at 392 (holding that a police officer uses excessive force where the suspect could not have actively resisted police in between a rapid series of taser applications). Here, Plaintiff was tased four different times over the course of thirty-four seconds. Kzinowek Body Cam 6:23–57. The entire time, Defendant Moore is yelling at Plaintiff to "put [his] hands behind his back." *Id.* Yet the video shows that Plaintiff is in agony from the repeated tasings and unable to comply. *Id.* Thus, the repeated tasings in such a short time constitute another constitutional violation.

Defendant Moore argues that a suspect who refuses to be handcuffed is actively resisting, so his use of the taser does not violate the Fourth Amendment. ECF No. 47 at PageID.544; ECF No. 55 at PageID.1440. He cites four cases for this assertion: *Hagans v. Franklin Co. Sheriff's Office*, *Caie v. West Bloomfield*, *Eldridge v. City of Warren*, and *Kapuscinski v. City of Gibraltar*. But all four cases are easily distinguishable.

First, *Caie* involved plaintiffs who were far more violent at the outset of the arrest that led to the tasing. In *Caie*, the plaintiff was both suicidal and heavily intoxicated, had escaped from his family, and rowed out to the middle of a lake with the reported intention of killing himself. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 93–94 (6th Cir. 2012). Once he returned to land, he behaved erratically and commented repeatedly that he "should fight the officers so that they would have a reason to kill him." *Id.* at 94. The officers were forced to secure him on the ground to transport him to a mental health treatment facility. *Id.* The officers partially constrained him on the

ground, but when he continued to resist by refusing to remove his hands from under him for handcuffing, an officer tased him in drive stun mode. *Id.*

The Sixth Circuit noted the plaintiff's aggression and intoxication, his suicidal ideations, his attempt to flee, and his verbal threats of physical violence, which presented a strong risk to the safety of the officers and the plaintiff himself. *Id.* at 96–97. None of the above were at issue in Plaintiff's case, especially because he had stopped resisting, with his hands visible in a defensive posture, for at least a minute and a half *before* Defendant Moore fired the taser the first time. Kzinowek Body Cam 4:53–6:23. Plaintiff did not swear at any of the officers and never directed threats at them. *See generally* ECF No. 47-14. Thus, Plaintiff's case is distinguishable.

Plaintiff's case is also distinguishable from *Hagans*. In *Hagans*, the plaintiff was intoxicated by crack cocaine, erratically ran from officers, attempted to break into a police cruiser with the officer still inside, and, upon being tackled to the ground by another officer, continued to kick and scream and even continued to tussle with officers *after* he had been tased. *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 507 (6th Cir. 2012). Not so here. Nothing indicates that Plaintiff was intoxicated or that he fought any of the Defendants or kicked and screamed at them. In fact, Defendant Jackson's body cam indicates that Plaintiff was attempting to *defuse* the situation between himself and the officers when he was tased, not escalate it. *See* ECF No. 47-14 at 5:09 ("You don't have to do this, sir"), 5:35 ("Please, I'm begging you), 5:46 ("[W]hy are we like this?").

Indeed, the third case Defendants cite, *Eldridge*, explains why the situations in both *Caie* and *Hagans* are not like Plaintiff's case:

> [In *Caie*], we concluded that a suspect was actively resisting arrest because he refused to move his arms from underneath his body so as to facilitate handcuffing . . . . *But this act of noncompliance was not evaluated in isolation; rather, it was the final straw in a series of consciously-resistive acts, one of which included a*

> *statement that the suspect would "fight the officers so that they would have a reason to kill him."* . . . That statement, along with a lack of physical cooperation, demonstrated a deliberate choice to be defiant.
>
> Consider, too, the circumstances in Hagans. In that case, *the suspect had been physically active—he resisted arrest by laying down on the pavement and deliberately locking his arms tightly under his body while kicking and screaming so as to avoid arrest* . . . . We noted that these actions indicated that the suspect was "out of control" and "forcefully" resisting arrest . . . . This justified an officer's use of a Taser.

533 F. App'x 529, 534 (6th Cir. 2013) (emphasis added). Because the lead up to Defendant Moore's tasing did not involve either physical violence or verbal threats from the Plaintiff, he was not actively resisting by refusing to put his hands behind his back for handcuffing. Therefore, Defendant Moore's tasings were unconstitutional.

Lastly, Defendant argues that *Kapuscinski v. City of Gibraltar*, 821 F. App'x 604 (6th Cir. 2020), demonstrates that refusing to be handcuffed is active resistance. But again, the events leading up to the plaintiff's tasing in that case are dramatically more violent. In *Kapuscinski*, the plaintiff was tased after he refused to release a woman whose head he had trapped beneath his thighs while he screamed out, "I'm going to kill her, I'm going to kill you." *Id.* at 606. Indeed, the Sixth Circuit held that the officer's use of the taser was appropriate because of the plaintiff's potential harm to the other person. *Id.* at 612 ("[Plaintiff] remained in an aggressive posture until [the officer's] taser discharge incapacitated him. Therefore, from the perspective of a reasonable officer, the threat posed by [the plaintiff] was sufficiently great that [the officer's] defensive use of a taser was justified"). Like all previous cases, this one too is distinguishable.

### ii. Clearly Established

Defendant Moore argues that he is entitled to qualified immunity. He is incorrect. It was clearly established on July 26, 2020, the day of the arrest, that tasing a suspect who was no longer actively resisting is a violation of the Fourth Amendment. *See Shumate*, 44 F.4th at 450 ("By 2019,

when this incident occurred, the right to be free from physical force when one is not actively resisting the police was clearly established."); *see also Griffith v. Coburn*, 473 F.3d 650, 659–60 (6th Cir. 2007) (noting that it was clearly established that officers may not use gratuitous violence against an individual who "pose[s] no threat to the officers or anyone else"); *Kent* 810 F.3d at 392 ("That submissive posture also undermines the deputies' argument that Kent was 'actively resisting arrest.' We have often found that the reasonableness of an officer's use of a taser turns on active resistance: 'When a suspect actively resists arrest, the police can use a taser [ ] to subdue him; but when a suspect does not resist, or has stopped resisting, they cannot.'") (citation omitted).

As explained, Plaintiff was no longer actively resisting arrest when tased by Defendant Moore, and, in fact, had his hands raised palm up in a submissive posture. Kzinowek Body Cam 5:23–6:23. At worst, Plaintiff was passively resisting by not complying with Defendant Moore's request to put his hands behind his back, and, even if that first tasing had been constitutional, the subsequent tasings in a short period of time have been clearly established as a violation of a plaintiff's Fourth Amendment rights. *See City of Troy,* 874 F.3d at 946*.* Thus, Defendant Moore is not entitled to qualified immunity.

### 3. False Arrest

Next, turn to Plaintiff's false arrest claims. A false arrest claim requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff. *Voyticky v. Vill. of Timberlake,* 412 F.3d 669, 677 (6th Cir. 2005). As noted, both Defendants Jackson and Moore had probable cause to arrest Plaintiff. *See supra* Section III.A.1.a. So Plaintiff's false arrest claims are not viable.

Even if Plaintiff could establish that Defendants did not have probable cause to arrest him, Defendants are entitled to qualified immunity. Plaintiff asserts no new case law that clearly establishes that Defendants' conduct was unconstitutional; instead, it "refers the Court to his prior arguments on the topic." ECF No. 53 at PageID.804. As the Court has noted, the previous cases

Plaintiff cited cannot clearly establish that either Defendant's conduct was unconstitutional. *See supra* Section III.A.1.a. Thus, Plaintiff's false arrest claim is also barred by qualified immunity.

### 4. Malicious Prosecution

Next, turn to Plaintiff's federal malicious prosecution claims against both Defendants Jackson and Moore. These claims also fail.

For his Fourth Amendment malicious prosecution claim, Plaintiff must show that (1) Defendants "made, influenced, or participated in the decision to prosecute," (2) there was "a lack of probable cause for the criminal prosecution," (3) that he suffered a resulting "deprivation of liberty," and (4) that the criminal proceeding was "resolved in [his] favor." *Ramsey v. Rivard*, 110 F.4th 860, 867 (6th Cir. 2024) (quoting *Sykes v. Anderson*, 625 F.3d 294, 308–09 (6th Cir. 2010)).

### a. Defendant Moore

Starting with Defendant Moore, Plaintiff's malicious prosecution claim fails at step one. Plaintiff does not adequately contend that Defendant Moore was involved in the criminal charges against Plaintiff. Instead, the Detective Bureau, along with the Prosecutor's Office, made the charging decision. ECF No. 47-6 at PageID.661. And Plaintiff presents no evidence that Defendant Moore did anything more than submit a supplemental police report to the prosecutor's office. *See generally* ECF No. 53. But the Sixth Circuit has held that merely submitting a police report to prosecutors is not enough to satisfy prong one of the malicious prosecution analysis. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002) (emphasis added). Thus, the malicious prosecution claim against Defendant Moore fails as a matter of law.

### b. Defendant Jackson

### i. Constitutional Analysis

Turn to Defendant Jackson. Plaintiff's malicious prosecution claims fail against him under prong one as well.

First, Defendants argue that Defendant Jackson did not influence the prosecution of Plaintiff. ECF No. 47 at PageID.547. But Defendant Jackson admitted that he referred Plaintiff for trespassing charges. ECF No. 53-27 at PageID.1053. And he suggested that Plaintiff be cited for trespassing in the first place. *See* ECF No. 53-19. The Sixth Circuit has held that an officer influences the prosecution of a suspect when they provide a sworn statement in an affidavit for an arrest warrant. *See Miller v. Maddox*, 866 F.3d 386, 390 (6th Cir. 2017). Here, Defendant Jackson went a step further and wrote the citation himself.

If that is where the prong one analysis ended, then Defendant Jackson would have influenced the prosecution sufficiently to satisfy prong one. But that is not where this Court's analysis ends. Viable malicious prosecution claims require "some element of blameworthiness or culpability in the participation—albeit less than 'malice.'" *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015). This blameworthiness must be "something beyond mere negligence or innocent mistake, to satisfy the elements of a malicious prosecution claim under the Fourth Amendment." *Id.* at 655. Plaintiff does not allege any material facts that demonstrate that Defendant Jackson's mistake as to the fact that he was standing on public land was anything more than mere negligence. Plaintiff only alleges that Defendant Jackson "testified in trial that [Plaintiff] trespassed on FOP Lodge Property, even after being provided a survey demonstrating [Plaintiff] wasn't." ECF No. 53 at PageID805. But this argument is flawed because Defendant Jackson was shown this survey only at the criminal trial. Thus, it cannot be used to show that he was anything more than merely negligent in filing the charges or in influencing the *decision to prosecute* Plaintiff. Plaintiff's malicious prosecution claims against Defendant Jackson fail as a matter of law.

### *ii. Clearly Established*

Even if Plaintiff could prove a constitutional violation under their malicious prosecution claims, Defendant Jackson's conduct is subject to qualified immunity.

Plaintiff fails to cite any cases clearly establishing that Defendant's conduct was unconstitutional. Plaintiff cites *Sykes v. Anderson*. Defendant Jackson's conduct, however, is distinguishable. Unlike here, in *Sykes*, the requisite blameworthiness was established: both defendant officers testified for the prosecution, and each made false statements, flagrant misrepresentations, or failed to disclose key evidence. 625 F.3d 294 at 301–02, 306–07, 311–17.

Plaintiff also cites *Ramsey*, but the Sixth Circuit never reached the merits of the malicious prosecution argument because it determined that it did not have jurisdiction because the Defendant's arguments on appeal relied upon a "crucial" dispute of fact. *Ramsey v. Rivard*, 110 F.4th 860, 867 (6th Cir. 2024). Plaintiff has not pointed to such a "crucial" dispute of fact in his malicious prosecution claim. Second, an opinion that does not reach the merits of a claim cannot clearly establish law. *See Kanuszewski*, 927 F.3d at 423. As a result, Defendant Jackson is entitled to qualified immunity.

## 5. Conspiracy

Lastly, Plaintiff asserts a § 1983 conspiracy claim against Defendants Jackson and Moore. "To prevail on a civil conspiracy claim, [Plaintiff] must show that (1) a 'single plan' existed, (2) [the Defendants] 'shared in the general conspiratorial objective' to deprive [Plaintiff] of his constitutional (or federal statutory) rights, and (3) 'an overt act was committed in furtherance of the conspiracy that caused injury' to [Plaintiff]." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985)). "Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy [and] [e]ach conspirator need not have known all of the details of the illegal plan or all of the participants involved." *Id.* But a conspiracy must be established with some degree of specificity and "vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim

under § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987). Plaintiff does not support his allegations of conspiracy with enough specificity to overcome this threshold.

Plaintiff frames his conspiracy arguments as follows: "Acting jointly, Defendant[s] engaged and participated in, and acted in furtherance of, a conspiracy, the predominant purpose of which was to unconstitutionally deprive Plaintiff of his rights of freedom of speech and assembly guaranteed under the First [A]mendment . . . ." ECF No. 20 at PageID.204. Plaintiff alleges the following proofs of this conspiracy: (1) the fact that either Defendant Jackson[10] contacted Sergeant Lopez to see if he wanted Plaintiff and GOGF removed, *id.*; (2) the allegations that Defendant Jackson participated in the "Blue Flu" in response to the firing of Officer Collier, ECF No. 53 at PageID.808; (3) the fact that Jackson had posted on social media utilizing the hashtag #AllLivesMatter, a common rebuke to the BlackLivesMatter movement, *id.* at PageID.809; and (4) a statement that Sergeant Lopez made during his deposition, *id.* None of these facts provides a question of material fact that Defendants conspired to deprive Plaintiff of his First Amendment rights to free speech or assembly.

To begin with, it is undisputed that Defendant Jackson spoke with Sergeant Lopez about the protesters and asked whether he wanted them removed for trespassing. ECF No. 53-30 at PageID.1337–38. It is also undisputed that Defendant Jackson posted an image with the hashtag #AllLivesMatter in 2014. ECF No. 53-23 at PageID.902. It is not disputed that Defendants Jackson and Moore were investigated for possible participation in the "Blue Flu," but it is disputed whether their participation was confirmed. ECF No. 53-8 at PageID.841. Regardless, construed in favor of the Plaintiff, none of these facts indicates that Defendants Jackson and Moore conspired to deprive

---

[10] The Amended Complaint alleges that either Defendant Jackson or Moore called Sergeant Lopez. ECF No. 20 at PageID.204. But Plaintiff now seemingly agrees that Defendant Jackson placed the call to Sergeant Lopez. ECF No. 53 at PageID.789.

him of his First Amendment rights to speech and assembly. At worst, they demonstrate that Defendant Jackson, in particular, did not support the BlackLivesMatter movement, but nothing is specific to Plaintiff, nor does it demonstrate intent to deprive him of his First Amendment rights.

Plaintiff also relies on an admission from Sergeant Lopez that his removal was not for a "safety or security," but rather because "it was just that people were there protesting and that's not what we're about." ECF No. 53 at PageID.809. Even if one were to view this sentiment as animus towards protesters, Lopez would still be within his rights to ask for the removal of people he thought were trespassing. This is indicated by the remaining portion of Sergeant Lopez's answer omitted from Plaintiff's brief: "I don't know what their protesting was about but, yeah, if they didn't have permission, then I wanted them to be removed." ECF No. 53-30 at PageID.1342.

Lastly, even if Plaintiff had alleged material facts with specificity for his conspiracy claim, he has not identified any sufficiently on-point case to overcome qualified immunity. *Revis v. Meldrum Revis* held that the defendants *did not* act according to a conspiracy. 489 F.3d 273, 292 (6th Cir. 2007). *Fremont Reorganizing Corp. v. Duke* is a district court case, not a Sixth Circuit opinion. 811 F. Supp. 2d 1323 (E.D. Mich. 2011). *Bazzi v. City of Dearborn* is the closest to clearly establishing that the Defendants' conduct was unconstitutional, but *Bazzi* is easily distinguishable. In *Bazzi*, the plaintiff alleged that an acquaintance and two police officers conspired to bring false charges against him and unlawfully seize him to have him sent back to prison on a supervised-release violation. 658 F.3d at 600. But the facts in *Bazzi* were quite different, including that (1) there was evidence that one of the officers fabricated a police report, (2) the second officer, who conducted a traffic stop on the plaintiff, did not cite the plaintiff after the stop, and even apologized for inconveniencing him, and (3) another officer on the scene noted that the initial stop was for a suspicion of a stolen vehicle, which was later admitted as false. *Id.* at 601–03. Here, Plaintiff was

cited for his offense, and there is no indication that the charges against him were fabricated; instead, both Defendants mistakenly believed that FOP's property line ended at a particular point. Thus, Defendants are entitled to qualified immunity for this claim.

## B. State Law Claims Against Defendants Jackson and Moore

Turn to Plaintiff's state law claims against Defendants Jackson and Moore, addressed below.

### 1. Malicious Prosecution Under State Law

Plaintiff asserts a state-law malicious prosecution claim against Defendants Jackson and Moore. In state malicious prosecution actions, plaintiffs must prove four elements: "(1) that the defendant has initiated a criminal prosecution against him, (2) that the criminal proceedings terminated in his favor, (3) that the private person who instituted or maintained the prosecution lacked probable cause for his actions, and (4) that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice." *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 363 (Mich. Ct. App. 2003) (quoting *Matthews v. Blue Cross & Blue Shield of Michigan*, 572 N.W.2d 609–10 (Mich. 1998)).

Defendants do not attack any of the elements of Plaintiff's claim, opting to argue that they are immune under Michigan's Government Tort Liability Act ("GTLA"). Defendants argue that they are entitled to governmental immunity under the GTLA because they satisfy each of the criteria under Mich. Comp. Laws § 691.1407(2). But the Michigan Supreme Court held in *Odom v. Wayne Cnty.* that § 691.1407(2) immunity "encompasses only negligent tort liability" because the GTLA expressly preserves "the law of intentional torts as it existed before July 7, 1986." 760 N.W.2d 217, 222 (Mich. 2008) (emphasis added) (quoting Mich. Comp. Laws § 691.1407(3)). Malicious prosecution is an intentional tort under Michigan state law. *See Odom*, 760 N.W.2d at 220 ("plaintiff alleged that defendant had committed the intentional torts of false imprisonment and *malicious prosecution*").

- 41 -

Even so, the test for determining governmental actors' liability for intentional torts falls under a different provision with different requirements: the acts were (1) "undertaken during the course of employment and the employee was acting, or reasonably believed that he was acting, within the scope of his authority"; (2) "undertaken in good faith, or were not undertaken with malice"; and (3) "discretionary, as opposed to ministerial." *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 784 (6th Cir. 2015) (citing *Odom*, 760 N.W.2d at 228). It is undisputed that Defendants arrested Plaintiff in their discretion, during their employment, and within the scope of their authority. *See* ECF No. 47 at PageID.548; ECF No. 53 at PageID.805; *see Ross v. Consumers Power Co.*, 363 N.W.2d 641, 648 (Mich. 1984) (noting "discretionary acts" involve significant decision-making while "ministerial acts" concern the execution of a decision and may only involve "minor decision-making"). Plaintiff attacks only prong two of the analysis: whether the Defendants acted in good faith, without malice. Defendants did.

For intentional tort claims, "a police officer is entitled to immunity if he acted in good faith *and honestly believed* that he had probable cause to arrest, even if in fact he lacked probable cause." *Hunt v. Hunt*, No. 284485, 2009 WL 1228795, at *2 (Mich. Ct. App. May 5, 2009) (emphasis added). "Conversely, if he acted with 'malicious intent, capricious action or corrupt conduct' or 'willful and corrupt misconduct' when making an arrest, governmental immunity will not protect him even if probable cause is found." *Id.* (quoting *Odom*, 760 N.W.2d at 225).

Plaintiff presents no evidence that Defendant Moore did anything more than submit a supplemental police report to the prosecutor's office. *See* ECF No. 47-6 at PageID.661. And Defendant Jackson had probable cause to arrest Plaintiff, *see supra* III.1.i.a. While he may have been erroneous or even negligent in failing to check whether Plaintiff was on public land using GIS imagery, there is no evidence indicating that he acted maliciously. *See supra* III.4.b.i. Again,

- 42 -

it was so unclear that Plaintiff was on public land that he needed an expert witness to trace the land plats back to the 1800s. *See* ECF No. 47-11 at PageID.711. Therefore, Defendants are entitled to immunity under the GTLA from Plaintiff's state law malicious prosecution tort claim.

Even if Defendants were not entitled to immunity, Plaintiff would not be able to meet *his* burden in proving the final two elements of a malicious prosecution claim under state law: that the person who instituted or maintained the prosecution lacked probable cause for his actions, and that the action was undertaken with malice or a purpose in instituting the criminal claim other than bringing the offender to justice. *Peterson Novelties*, 259 Mich. App. at 672. Again, Defendants had probable cause to arrest Plaintiff, and nothing in Plaintiff's allegations suggests more than mere negligence, not malice, in their decision to charge and prosecute him. Therefore, Plaintiff's claims fail both on the merits and under GTLA immunity.

### 2. State Law Assault and Battery Claim

Plaintiff asserts a state law assault and battery against both Defendants Jackson and Moore.[11] Under Michigan law, an assault is an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery. *Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011). A battery is an unintentional, unconsented, and harmful or offensive touching of the person of another, or of something closely connected with the person. *Id.* But government actors are permitted "to act in ways that would, under different circumstances, subject them to liability for an intentional tort." *VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (2004). To

---

[11] Defendant does not assert a GTLA defense to Plaintiff's state law assault and battery claims. *See* ECF No. 47 at PageID.554–556. As Plaintiff correctly points out, Defendant officers bear the burden of demonstrating government immunity. *King v. City of Rockford, Michigan*, 97 F.4th 379, 399 (6th Cir. 2024); *see also Odom*, 760 N.W.2d at 227–28.

find for Plaintiff, the Court "would have to determine that the officers' actions were not justified because they were not objectively reasonable under the circumstances." *Id.*

As noted, Defendant Jackson's actions were objectively reasonable under the circumstances because the knee strikes he administered were in response to Plaintiff's active resistance. *See supra* Section III.A.2.a.i. But Defendant Moore's repeated tasing of Plaintiff was not objectively reasonable under the circumstances because by the time he tased Plaintiff the first time, he was no longer actively resisting. *See supra* Section III.A.2.b.i. Thus, only the assault and battery claims against Defendant Moore survive summary judgment.

### C. Monell Claims

Finally, Plaintiff asserts a *Monell* liability claim against the City of Saginaw under both failure to train and ratification theories.

### 1. Failure to Train

Municipal liability can be demonstrated in several ways, including (1) showing that the City has a custom or practice of tolerating or permitting constitutional violations, (2) that it failed to properly train and supervise employees, or (3) that a high-ranking policymaker ratified a subordinate's unconstitutional action. *Breathe v. City of Detroit*, 484 F. Supp. 3d 511, 518 (E.D. Mich. 2020), order clarified, No. 20-12363, 2020 WL 8575150 (E.D. Mich. Sept. 16, 2020) (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)).

For failure to train or supervise claims, plaintiffs must prove three things: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Here, Plaintiff does not establish *Monell* liability under a failure-to-train theory.

- 44 -

First, Plaintiff argues that the City of Saginaw has failed to train its officers on probable cause. ECF No. 53 at PageID.812. While Plaintiff points to several recent cases in which the City of Saginaw failed to adequately train its officers, this Court has already found that Defendants had probable cause to arrest Plaintiff. Rather, the only unconstitutional action was Defendant Moore's excessive force in tasing Plaintiff when he was passively resisting. And Plaintiff has not identified any evidence in the record that demonstrates that either Defendant Jackson or Moore was not given training on probable cause. Thus, this argument fails from the start.

Second, Plaintiff argues that Defendants Jackson and Moore never received any training related to demonstrations or protests. *Id.* Plaintiff alleges, and each officer admitted, that they are handed "a crowd control" policy upon hire, and there is no requirement to review it after that. *Id.* Plaintiff alleges that, despite repeated demonstrations during the summer of 2020 in response to the death of George Floyd, the SPD did not review the crowd control policy with officers. *Id.* at PageID.813. According to Plaintiff, this led to Defendant Moore's excessive force. But Plaintiff's arguments do not prove deliberate indifference.

Under a failure-to-train theory, deliberate indifference can be demonstrated in two different ways. The Supreme Court has stated generally that the risk of the municipality's failure to train or supervise must be so obvious—either (1) because of a pattern of similar violations, or (2) in rare cases, because the need for training was so evident that failing to provide any training amounts to indifference. *See Connick v. Thompson*, 563 U.S. 51, 61–63 (2011); *Canton*, 489 U.S. at 390 n.10. As a result, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 60.

Plaintiff argues for the latter of the two theories: that he can establish deliberate indifference as a "highly predictable consequence of a failure to equip [employees] with specific

tools to handle recurring situations.'" But this theory is only available "'in a narrow range of circumstances.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) (*quoting Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 739 (6th Cir. 2015)). Further, this theory only requires a "single violation of federal rights." *Shadrick*, 805 F.3d at 739.

It is not obvious that SPD's lack of training in crowd control would naturally result in officers using excessive force. Indeed, Plaintiff cites only one case where a failure to train was so sufficiently obvious that the Sixth Circuit held that a failure to provide any training amounted to deliberate indifference: *Ouza v. City of Dearborn Heights*. But *Ouza* is distinguishable.

In *Ouza*, the City of Dearborn Heights had not provided any training on probable cause. The Sixth Circuit held that, "given the *frequency* with which officers must evaluate probable cause and use force within the course of their duties… [the city's] complete failure to provide any type of training as to these two recurring situations may amount to deliberate indifference." *Ouza v. City of Dearborn Heights, Michigan*, 969 F.3d 265, 289 (6th Cir. 2020). But every officer must necessarily determine probable cause for an arrest, which is foundational to their job duties. That is not so with regard to crowd control or demonstrators, even during the summer 2020 protest uptick. And assessing probable cause is inherently a constitutional issue under the Fourth Amendment, whereas dealing with crowds or demonstrators is not. Regardless, both Defendant Jackson and Moore stated that they had received training on de-escalation or use of force, which is a far greater causal factor in the excessive force used by Defendant Moore in effectuating Plaintiff's arrest. *See* ECF Nos. 47-6 at PageID.655; 53-27 at PageID.1069–70.

In addition, the Sixth Circuit in *Ouza* expressed concern that officers received no performance reviews or had their conduct reviewed. 969 F.3d at 289. It was this fact "[t]aken together with Plaintiff's evidence of inadequate training" that led the court to believe that the city

of Dearborn Heights was deliberately indifferent to its citizens' constitutional rights. *Id.* It is Plaintiff's burden to develop this argument, but he has not done so. So the Court holds that the Plaintiff's *Monell* claim cannot succeed on a failure to train theory.

## 2. Ratification

Lastly, Plaintiff argues that the City of Saginaw ratified unconstitutional conduct. Ratification can occur when an official acting with final decision-making authority either (1) affirmatively approves "of a particular decision made by a subordinate" or (2) fails to "meaningfully investigate and punish allegations of unconstitutional conduct." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). Plaintiff argues that, in response to his arrest, both Chief of Police Ruth and City Manager Tim Morales[12] supported and ratified Defendants Jackson and Moore's conduct by issuing an official statement. ECF No. 53 at PageID.814; *see also* ECF No. 53-15. Seemingly, Plaintiff's argument is only relevant to scenario one and not scenario two of the ratification theory.

To succeed on either method, a plaintiff must identify a final decisionmaker who possesses "final authority to establish municipal policy with respect to the action ordered" and who then ratified the allegedly unconstitutional action. *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013). A plaintiff must also demonstrate that "a deliberate choice to follow a course of action is made from among various alternatives by the official . . . responsible for establishing final policy with respect to the subject matter in question." *Burgess*, 735 F.3d at 479 (citation modified). And "that course of action must be shown to be the moving force behind . . . the plaintiff's harm." *Id.*

---

[12] Plaintiff argues only that Chief Ruth has final decision-making authority. *See* ECF No. 53 at PageID.814.

Plaintiff contends that Chief Ruth and City Manager Morales' official statement is an affirmative approval of Defendant Moore's unconstitutional tasings. He argues that he can establish municipal liability under prong one of the ratification theory *after* the illegal conduct has occurred. ECF No. 53 at PageID.813. He relies solely on *Marchese v. Lucas*, 758 F.2d 181 (6th Cir. 1985), for this assertion.

In *Marchese*, sheriff's deputies beat a prisoner on the way into the patrol station, and then he was beaten by somebody whom the deputy had let into his cell later on that night. *Id.* at 182–183. The Sheriff then failed to order and direct an investigation to determine which deputies had perpetrated the unconstitutional action. *Id.* at 184. *Marchese* held that this utter failure to investigate constituted ratification of the illegal acts. *Id.* at 188. In this way, *Marchese* can be better understood as a failure to "meaningfully investigate and punish" unconstitutional conduct—the second scenario under *Feliciano*. 988 F.2d at 656. But the official statement makes clear that there *was* an investigation into Plaintiff's arrest. ECF No. 53-15 at PageID.862. Indeed, the second page of the official statement explains why the City believed that Defendants Jackson and Moore's actions were justified. *Id.* at PageID.863.

In addition, a statement to the media, without more, is inadequate to show ratification of a subordinate's conduct. *Stillwagon v. City of Delaware*, 175 F. Supp. 3d 874, 904 (S.D. Ohio 2016). And the official statement is inadequately tied to the actual harm that Plaintiff suffered. *Id.* He offers no allegations to indicate how the joint statement by Chief Ruth and City Manager Morales was the "moving force" behind Defendant Moore's unconstitutional conduct. Thus, Plaintiff's *Monell* claim also fails on ratification grounds.

In sum and for clarity, all claims as to Defendant Jackson are dismissed. All claims as to Defendant City of Saginaw are also dismissed. The only remaining claims are Count II and VII as to Defendant Moore.

## IV.

Accordingly, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 47, is **GRANTED IN PART** as to Counts I, II, III, IV, V, VII, and VIII as to Defendant Jackson.

Further, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 47, is **GRANTED IN PART** as to Counts I, III, IV, V, and VIII as to Defendant Moore.

Further, it is **ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 47, is **GRANTED IN PART** as to Counts VI as to Defendant City of Saginaw.

Further, it is **ORDERED** that Defendant's Motion for Summary Judgment is **DENIED IN PART** as to Count II pertaining to Defendant Moore's use of a taser during Plaintiff's arrest and as to Count VII's state claims of Assault and Battery, also against Defendant Moore. **This is not a final order and does not close this case.**

Dated: November 12, 2025       <u>s/Thomas L. Ludington</u>
                 THOMAS L. LUDINGTON
                 United States District Judge